Hassan A. Zavareei (SBN 181547)
Tycko &Zavareei LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: 202-973-0900
Facsimile: 202-973-0950
hzavareei@tzlegal.com
kaizpuru@tzlegal.com

Todd Walburg (SBN 213063)
Bailey & Glasser, LLP
475 14th Street, Suite 610
Oakland, CA 94612
510-207-8633 (p)
twalburg@baileyglasser.com

[Additional counsel in signature block]

*Counsel for Plaintiff*

# IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. CHENEY, individually, and on behalf of classes of similarly situated persons,<br><br>        Plaintiff,<br>v.<br><br>LAKEVIEW LOAN SERVICING, LLC,<br><br><br>        Defendant. | Case No. CaseNumber<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br>**Action for Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; Breach of Contract; and Unjust Enrichment** |

Plaintiff Paul E. Cheney ("Plaintiff"), on behalf of himself and all others similarly situated, alleges violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), breach of contract, and unjust enrichment against Defendant Lakeview Loan Servicing, LLC ("Defendant" or "Lakeview"). In support of these claims, Plaintiff states as follows:

### NATURE OF THE ACTION

1. Defendant Lakeview Loan Servicing, LLC is the fourth largest mortgage loan servicer in the country.  On its website, Lakeview claims that it "helps" more than 1.4 million customers per year with payment of their mortgages.

2. Lakeview is impermissibly profiting from the customers it purports to help by charging and collecting illegal payment processing fees when borrowers make their monthly mortgage payments by telephone, by automated telephone system payment ("Interactive Voice Response" or "IVR") or online (collectively, "Pay-to-Pay Fees").

3. Lakeview charges homeowners Pay-to-Pay Fees of $15.00 for payment over the telephone, $12.00 for IVR payment, and $10 for online payment.

4. Lakeview services mortgages throughout the United States and is supposed to be compensated out of the interest paid on each borrower's monthly payment.  It is improper and unlawful for Lakeview to also collect from Plaintiff and putative class members additional "service" fees that do not reflect the cost to Lakeview of providing such services.

5. Lakeview's practice violates the UCL and breaches the uniform terms of borrowers' mortgages ("Uniform Mortgages").

6. Under California law, Lakeview cannot mark-up the amounts it pays third parties to provide borrowers' services and impose unauthorized charges to create a profit center for itself.

7. Upon investigation and belief, the actual cost for Lakeview to process online mortgage payment transactions is very low—well below the Pay-to-Pay Fees that Lakeview charges mortgagers. Lakeview pockets the difference as pure profit.

8.      Despite their uniform contractual obligations to charge only fees explicitly authorized by the Uniform Mortgages, applicable law and only those amounts actually disbursed, Lakeview leverages its position of power over homeowners and demands exorbitant Pay-to-Pay Fees.

9.      Even if some fee were allowed, the mortgage uniform covenants and state law only permit Lakeview to pass along the actual cost of fees incurred by it to the borrower – here only a few cents per transaction.

10.     Similarly, California law prohibits Lakeview from charging any fees that are not explicitly included in the mortgage agreement. None of the Pay-to-Pay Fees are permitted by the mortgage agreements, and, therefore, Lakeview violates California law by charging those fees.

11.     Plaintiff paid the Pay-to-Pay Fees assessed by Lakeview, and now brings this class action lawsuit, individually and on behalf of all others similarly situated, to recover the unlawfully charged Pay-to-Pay Fees and to enjoin Lakeview from continuing to charge these unlawful fees.

## JURISDICTION AND VENUE

12.     Subject matter jurisdiction exists under the Class Action Fairness Act because diversity exists between Lakeview and at least one class member and the amount in controversy exceeds $5,000,000.

13.     This Court has personal jurisdiction because Lakeview conducts business in California and commit torts in California, as described herein.

14.     Venue is proper because a substantial portion of the events alleged herein occurred within this District.

## PARTIES

15.     Plaintiff Paul E. Cheney (individually, "Plaintiff" or "Mr. Cheney") is a natural person residing in Concord, California who has a mortgage loan serviced by Lakeview. Mr. Cheney makes loan payments online, and each time he does so, Lakeview charges him a Pay-to-Pay Fee. For example, and as detailed below, on December 14, 2018 and February 13, 2019, Lakeview charged Mr. Cheney a $10.00 Pay-to-Pay Fee for making payments online.

16.     Defendant Lakeview Loan Servicing, LLC is a Delaware corporation with a principal place of business at 4425 Ponce de Leon Boulevard, 5th Floor, Coral Gables, Florida, 33146.

**APPLICABLE LAW**

*The Rosenthal Fair Debt Collection Practices Act*

17.    The Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act") is a remedial statute that should be interpreted broadly in order to effectuate its purpose.  *See generally* California Civil Code §§ 1788, *et seq.*

18.    The Rosenthal Act defines "debt collector" as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ. Code §1788.2(c).

19.    The Rosenthal Act defines a "consumer debt" as "money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." Cal. Civ. Code §1788.2(f).

20.    The Rosenthal Act defines "consumer credit transaction" as "a transaction between a natural person and another person in which property, services or money is acquired on credit by that natural person from such other person primarily for personal, family, or household purposes." Cal. Civ. Code §1788.2(e).

21.    The Rosenthal Act prohibits "[c]ollecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14(b).

22.    The Rosenthal Act also makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

23.    The Rosenthal Act makes it illegal for any entity covered by it to violate the federal Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17.

*The California Unfair Competition Law*

24.    The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

25.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

26.     In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

## FACTUAL ALLEGATIONS

*The Mortgage Servicer Industry*

27.     Mortgage lenders rarely service their own loans. In many cases, lenders specialize in the origination of the loan, but they are not equipped to handle the day-to-day administrative tasks that come with a mortgage. Instead of managing these duties in-house, they assign the servicing rights of their loans to a designated servicer—a company that specializes in the actual management and administration of mortgages.

28.     A mortgage servicer is a company that, in turn, handles the day-to-day administrative tasks of a mortgage loan, including receiving payments, sending monthly statements and managing escrow accounts.

29.     Lakeview is a mortgage loan servicer that operates throughout the country.

30.     Each time a mortgage borrower whose loan is serviced by Lakeview makes a payment over the phone or online, Lakeview charges the borrower a Pay-to-Pay Fee of $15.00 for payment over the telephone, $12.00 for IVR payment and $10.00 for online payment.

31.     The usual cost that a loan servicer pays to process Pay-to-Pay Transactions payments is much less for each transaction than the amounts Lakeview charges Plaintiff and the putative class members.

32.     Therefore, the actual cost for Lakeview to process telephone Pay-to-Pay Transactions is substantially below the amounts charged to borrowers for making those payments, and Lakeview illegally pockets the difference as profit.

**Class Action Complaint**
**Case No.** CaseNumber

33.     The mortgages of Plaintiff and the putative class that Lakeview service are Uniform Mortgages; that is, they are Fannie Mae/Freddie Mac Uniform Instruments used when originating Single-Family residential mortgage loans.

34.     The Uniform Mortgages of Lakeview's customers do not authorize it to charge Pay-to-Pay Fees.

35.     In fact, the Pay-to-Pay Fees violate borrowers' mortgages.

*Plaintiff Cheney*

36.     On or around August 6, 2018, Plaintiff Cheney obtained a mortgage loan from Loandepot.com, LLC secured by his home in Concord, California (the "Mortgage Agreement").

37.     The Mortgage Agreement is attached as **Exhibit A**.

38.     Pursuant to the terms of the promissory note signed by Mr. Cheney, his loan payments are due on the first day of each month.

39.     Mr. Cheney obtained the mortgage loan secured by his property for personal, family or household uses.

40.     After Mr. Cheney closed on the loan in August 2018, Lakeview acquired the servicing rights to the loan by way of an assignment.

41.     Mr. Cheney made mortgage payments online up until the time that he sold his house.

42.     Each time he did so, Lakeview charged him a Pay-to-Pay Fee.

43.     For example, on December 14, 2018, Mr. Cheney made a mortgage payment online and Lakeview charged him a $10 Pay-to-Pay Fee for making that online payment.

44.     On February 13, 2019, Mr. Cheney made a mortgage payment online and Lakeview charged him a $10 Pay-to-Pay Fee for making that online payment.

45.     When Mr. Cheney made his monthly mortgage payments, he made such payments after the first day of each month and after the due date for such payments.

46.     Mr. Cheney made timely mortgage payments up until the time he sold his house, and was never in default under the terms of the Mortgage Agreement.

47.     Pay-to-Pay Fees are not authorized by the Mortgage Agreement.

**Class Action Complaint**
**Case No. CaseNumber**

48. Lakeview collected the Pay-to-Pay Fees even though such fees are not authorized under the Mortgage Agreement.

49. The Mortgage Agreement states that the servicer "may not charge fees that are expressly prohibited by this Security Instrument, or by Applicable Law." Ex. A ¶ 14.

50. "Applicable Law" is defined as "all controlling applicable federal, state and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A at 2, ¶ (J).

51. The Mortgage Agreement further states that it is "governed by federal law and the law of the jurisdiction in which the Property is located," *i.e.*, California. Ex. A ¶ 16.

52. Charging Pay-to-Pay Fees not authorized by the Mortgage Agreement violated the Rosenthal Act, *i.e.*, California law. *See* Cal. Civ. Code §§ 1788.13(e), 1788.14(b), 1788.17.

53. By collecting Pay-to-Pay Fees in violation of "Applicable Law," *i.e.*, the Rosenthal Act, Lakeview breached the uniform covenants of the Mortgage Agreement.

54. Even if Lakeview was somehow permitted to collect a fee under the auspice that it is a default related fee, under Paragraph 9 of the Mortgage Agreement, Lakeview's demand for payment of Pay-to-Pay Fees was and is a direct breach of that paragraph, too.

55. Paragraph 9 of the Mortgage Agreement states that only "amounts *disbursed* by Lender under this Section 9 shall become an additional debt of Borrower secured by this Security Instrument." *See* Ex. A ¶ 9 (emphasis added).

56. Lakeview collected more than the amount they disbursed to process the Pay-to-Pay Transactions.

57. The above paragraphs are contained in the Uniform Covenants section of the Mortgage Agreement. Lakeview thus breached its contracts on a class-wide basis.

58. Prior to filing this Complaint, Mr. Cheney made a written pre-suit demand upon Lakeview.

59. Lakeview was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so.

**CLASS ACTION ALLEGATIONS**

60.     Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of the following class of persons (the "Class"), subject to modification after discovery and case development:

> All persons (1) with a residential mortgage loan securing a property in California, (2) serviced or subserviced by Lakeview, (3) and who paid a fee to Defendant for making a loan payment by telephone, IVR, at an ATM, or the internet, during the applicable statutes of limitations through the date a class is certified.

61.     Members of the Class ("Class Members") are identifiable through Lakeview's records and payment databases.

62.     Excluded from the class is Lakeview; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

63.     Plaintiff proposes that he serve as class representative.

64.     Plaintiffs and the Classes have all been harmed by the actions of Lakeview.

65.     Numerosity is satisfied. There are thousands of class members. Individual joinder of these persons is impracticable.

66.     There are questions of law and fact common to Plaintiff and to the Class, including, but not limited to:

a.     Whether Lakeview breached its mortgage contracts by charging Pay-to-Pay Fees not authorized by such agreements;

b.     Whether Lakeview violated the Rosenthal Act by charging Pay-to-Pay Fees not due;

c.     Whether Lakeview violated the UCL;

d.     Whether Lakeview's business practices are unfair;

e.     Whether Lakeview's business practices are unlawful;

f.     Whether Lakeview's costs of the Pay-to-Pay Transactions are less than the amount it charged for Pay-to-Pay fees;

g.     Whether Plaintiff and the Class were damaged by Lakeview's conduct;

h.     Whether Plaintiff and the Class are entitled to actual and/or statutory damages as a result of Lakeview's actions;

i.     Whether Plaintiff and the Class are entitled to restitution;

j.     Whether Plaintiff and the Class are entitled to injunctive relief;

k.     Whether Plaintiff and the Class are entitled to actual and/or statutory damages as a result of Lakeview's actions; and

l.     Whether Plaintiff and the Class are entitled to attorney's fees and costs.

67.     Plaintiff's claims are typical of the claims of Class members.  Lakeview charged Plaintiff Pay-to-Pay Fees in the same manner as the Class Members.  Plaintiff and the Class Members entered into uniform covenants in their Mortgage Agreements that prohibit Pay-to-Pay charges. Alternatively, if Lakeview is allowed under the Mortgage Agreements to charge Pay-to-Pay Fees, such amount is capped at the actual amounts disbursed by Lakeview to process the Pay-to-Pay Transactions.

68.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members and he will fairly and adequately protect the interests of the Class.  Plaintiff has taken actions before filing this Complaint, by hiring skilled and experienced counsel, and by making a pre-suit demand on behalf of Class members to protect the interests of the Class.

69.     Plaintiff has hired counsel that is skilled and experienced in class actions and are adequate class counsel capable of protecting the interests of the class members.

70.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

71.     The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## COUNT I

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**On Behalf of Plaintiff Cheney and the Class**

72.     Paragraphs 1 to 71 are hereby incorporated by reference.

73.     The California Unfair Competition Law ("UCL") defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

**Unlawful Prong**

74.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

75.     Lakeview's conduct violated the Rosenthal Act and the Fair Debt Collection Practices Act (the "FDCPA"). These violations are sufficient to support Mr. Cheney's and the Class's claim under the unlawful prong of the UCL.

76.     The Rosenthal Act applies to Lakeview because they regularly engage in debt collection as defined by the statute. Cal. Civ. Code § 1788.2.

77.     Lakeview knew that the Pay-to-Pay Fees were not expressly set out in the Mortgage Agreement or the mortgage agreements of the other Class Members, yet it collected them anyway.

78.     The Rosenthal Act makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

79.     By assessing Pay-to-Pay Fees, Lakeview represented that the mortgage loan debts of Mr. Cheney and the Class Members may be increased by the addition of the Pay-to-Pay Fees, even though Pay- to-Pay Fees may not be legally added to the existing obligation.

80.     This conduct violated the Rosenthal Act.

81.     The Rosenthal Act also prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

82.     When Lakeview collected Pay-to-Pay Fees from Mr. Cheney and members of the Class, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

83.     By charging Pay-to-Pay Fees, a portion of which it retains, Lakeview acted in violation of the federal FDCPA, which prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

84.     The mortgage agreements of Mr. Cheney and the members of the Class do not expressly authorize Lakeview to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit Lakeview to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

85.     Although the Mortgage Agreements of Mr. Cheney and the members of the Class do not expressly authorize collection of Pay-to-Pay Fees, Lakeview collected such fees anyway.

86.     In so doing, Lakeview violated 15 U.S.C. § 1692f.

87.     The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17. By violating the federal FDCPA, Lakeview violated the Rosenthal Act.

88.     As a result of the above conduct, Plaintiff Cheney and the Class have suffered economic injury, and Lakeview has been unjustly enriched at the expense of Mr. Cheney and members of the Class. Lakeview has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

89.     Through its unlawful acts and practices, Lakeview has improperly obtained money from Mr. Cheney and the members of the Class. As such, Mr. Cheney requests that the Court cause Lakeview to restore the money to Mr. Cheney and the Class

**Unfair Prong**

90.     In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

91.     Lakeview's actions constitute "unfair" business practices because, as alleged above, Lakeview engaged in the immoral, unethical, oppressive, and unscrupulous practice of charging Pay-to- Pay Fees not authorized by the Uniform Mortgages or applicable law. Lakeview's unfair practices were substantially injurious to consumers, who were forced to pay $10 to $15 each time they wished

to make payments online or by phone. Because Lakeview imposed Pay-to-Pay Fees on all forms of online and telephone payment, Plaintiff Cheney and the Class were not able to make payments online or by telephone without facing injury. And, because Lakeview charged fees well above the actual cost of providing online or phone payment services, there are no countervailing benefits to consumers or competition that outweigh the injuries suffered by Plaintiff Cheney and the Class.

92.     As a result of the above conduct, Plaintiff Cheney and the Class have suffered economic injury, and Lakeview has been unjustly enriched at the expense of Mr. Cheney and members of the Class. Lakeview has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

93.     Through its unlawful acts and practices, Lakeview has improperly obtained money from Mr. Cheney and the members of the Class. As such, Mr. Cheney requests that the Court cause Lakeview to restore the money to Mr. Cheney and the Class.

**COUNT II**
**BREACH OF CONTRACT**
**On Behalf of Plaintiff Cheney and the Class**

94.     Paragraphs 1 to 93 are hereby incorporated by reference.

95.     Plaintiff and the members of the Class are parties to contracts with Lakeview. Lakeview became bound as an assignee to the mortgages held by Plaintiff and the Class Members when it became the servicer of their mortgage loans. Lakeview breached its contracts with Plaintiff and the Class Members when it charged Pay-to-Pay Fees in violation of the Uniform Mortgages and in excess of the amounts actually disbursed by Lakeview to pay for the cost of the Pay-to-Pay Transactions.

96.     Plaintiff and the Class Members suffered damages when Lakeview violated its contracts with them by assessing Pay-to-Pay Fees.

97.     Mr. Cheney purchased a home subject to the Mortgage Agreement. *See* Ex. A. When Lakeview accepted an assignment of such mortgage and became the servicer of the mortgage, it became a party to the Mortgage Agreement. Thus, Lakeview became bound as an assignee by the

Mortgage Agreement with Mr. Cheney whereby money was lent to Mr. Cheney to purchase property in exchange for certain payment over time. *See* Ex. A ¶¶ 13, 20.

98.     Mr. Cheney made payments online. Each time he did so, Lakeview charged him a Pay-to-Pay Fee. For example, on December 14, 2018 and again on February 13, 2019, Lakeview charged Mr. Cheney a $10.00 Pay-to-Pay Fee when he made a mortgage payment online.

99.     These fees were not authorized by the Mortgage Agreement.

100.    The Mortgage Agreement states that "[t]his Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located," i.e., California. Ex. A ¶ 16. It further states that "Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law." *Id.* ¶ 14.

101.     "Applicable Law" is defined as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A at 2 ¶ (J).

102.    Charging Pay-to-Pay Fees not authorized by the Mortgage Agreement violated the Rosenthal Act, i.e., California law. *See* Cal. Civ. Code §§ 1788.13(e), 1788.14(b), 1788.17.

103.    By collecting Pay-to-Pay Fees in violation of "Applicable Law," i.e., the Rosenthal Act, Lakeview breached the uniform covenants of the Mortgage Agreement.

104.    Even if the Pay-to-Pay Fees could somehow be construed as a default-related fee under ¶ 9, "Protection of Lender's Interest in the Property and Rights Under This Security Instrument" section, that section permits only "amounts *disbursed* by lender" to become the debt of the borrower.  *See* Ex. A ¶ 9 (emphasis added). By assessing more than the amounts it actually disbursed to the balance of Mr. Cheney's mortgage, Lakeview violated ¶ 9 of the Mortgage Agreement.

105.    Because the above provisions are contained in the "Uniform Covenants" section of the Mortgage Agreement, Lakeview have breached their contracts on a class-wide basis.

106.    Plaintiff Cheney and the members of the Class were damaged by Lakeview's breach.

**COUNT III**
**UNJUST ENRICHMENT**
**On Behalf of Plaintiff Cheney and the Class**
**(pled in the alternative to breach of contract claims)**

107.    Paragraphs 1 to 106 are hereby incorporated by reference.

108.    Plaintiff and the members of the Class conferred benefits on Lakeview. Namely, Plaintiff and the Class Members paid Pay-to-Pay Fees to Lakeview.

109.    Lakeview's retention of these benefits is unjust because Lakeview had no right to collect the Pay-to-Pay Fees under the Uniform Mortgages or applicable law.

110.    Plaintiff and the Class Members are entitled to restitution and Lakeview are required to disgorge the benefits it unjustly obtained.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and others similarly situated, respectfully requests that the Court:

- Certify the proposed Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- Award damages, including compensatory and exemplary damages, to Plaintiff and the Class in an amount to be determined at trial;

- Award statutory damages and/or penalties to Plaintiff and the Class;

- Permanently enjoin Lakeview from the wrongful and unlawful conduct alleged herein;

- Award Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

- Award pre- and post-judgment interest to the extent provided by law; and

- Award such further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A JURY ON ALL ISSUES SO TRIABLE.**

Dated: May 1, 2020                          /s/ Todd Walburg
                                            Todd Walburg (SBN 213063)
                                            BAILEY & GLASSER, LLP
                                            475 14th Street, Suite 610
                                            Oakland, CA 94612
                                            510-207-8633 (p)
                                            twalburg@baileyglasser.com

                                            Victor S. Woods (*pro hac vice* application forthcoming)

**Class Action Complaint**
**Case No. CaseNumber**

1

2   BAILEY & GLASSER, LLP
    209 Capitol Street
3   Charleston, WV 25301
    304-345-6555 (p)
4   304-342-1110 (f)
    vwoods@baileyglasser.com
5
    Hassan A. Zavareei (SBN 181547)
6   TYCKO & ZAVAREEI LLP
    1828 L Street NW, Suite 1000
7   Washington, D.C. 20036
    202-973-0900 (p)
8   202-973-0950 (f)
    hzavareei@tzlegal.com
9   kaizpuru@tzlegal.com

10  *Counsel for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Class Action Complaint**
**Case No.** CaseNumber

# EXHIBIT A

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
RESIDENTIAL DIVISION

Recording Requested By /
Return To:
LOANDEPOT.COM, LLC
25500 COMMERCENTRE DR, SUITE
100
LAKE FOREST, CA 92630
(888) 337-6888
ATTN: DOC CONTROL

Prepared By:
AMY MICHELANGELO
LOANDEPOT.COM, LLC
26642 TOWNE CENTRE DRIVE
FOOTHILL RANCH, CA 92610
(888) 337-6888

5718947

2018901284990016
CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
DOC 2018-0128499-00
Acct 7257-DPS First American Title Santa Ana
Monday, AUG 13, 2018 08:41:15
SB2 $75.00|MOD $16.00|REC $26.00
FTC $15.00|DAF $2.70|REF $0.30
RED $1.00|ERD $1.00|
Ttl Pd $137.00      Nbr-0003277426
MLB/RC/1-16

[Space Above This Line For Recording Data]

## DEED OF TRUST

CHENEY
Loan # 600104156
MIN: 100853706001041563
MERS Phone: 1-888-679-6377
PIN 118-360-003

Trustor/Borrower:
PAUL E CHENEY
5450 KIRKWOOD DR #A4, CONCORD, CA 94521 UNITED STATES

Property Address: 5450 KIRKWOOD DR #A4, CONCORD, CA 94521

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated AUGUST 6, 2018, together with all Riders to this document.

(B) "Borrower" is PAUL E CHENEY AND BONNIE J CHENEY, HUSBAND AND WIFE AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP. Borrower is the trustor under this Security Instrument.

(C) "Lender" is LOANDEPOT.COM, LLC. Lender is a LIMITED LIABILITY COMPANY organized and existing under the laws of DE. Lender's address is 26642 TOWNE CENTRE DRIVE, FOOTHILL RANCH, CA 92610.

(D) "Trustee" is NORTHWEST TRUSTEE SERVICES, INC..

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated AUGUST 6, 2018. The Note states that Borrower owes Lender FOUR HUNDRED ONE THOUSAND AND 00/100 Dollars (U.S. $401,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 1, 2048.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.58                                   Page 1 of 12                              Form 3005 1/01

0046000000600104156

600104156

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider          ☒ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider                  ☐ Planned Unit Development Rider   ☐ Biweekly Payment Rider
☐ 1-4 Family Rider               ☐ Other(s) [specify]

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **CONTRA COSTA**:  See Exhibit "A" attached **SEE PRELIM**
which currently has the address of **5450 KIRKWOOD DR #A4, CONCORD, CA 94521** ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant

0046000000600104156

600104156

and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to



0046000000600104156

600104156

pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and

600104156

tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
312.58                                   Page 5 of 12                                   Form 3005 1/01

0046000000600104156

600104156

proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate

600104156

provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

0046000000600104156

600104156

action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until

0046000000600104156

600104156

actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant

312.58                                                    Page 9 of 12                                                    Form 3005 1/01

0046000000600104156

600104156

or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

   Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

   NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

   **22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

   **If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

600104156

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above.

_____
BORROWER – PAUL E CHENEY

_____
BONNIE J CHENEY

600104156

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of **CALIFORNIA**                                )
                                                       )
County of **CONTRA COSTA**                             )

On _6 of August 2018_ before me, _Carlos Madrigal, Notary Public_ ,
                                                       (here insert name and title of the officer)

personally appeared **PAUL E CHENEY, BONNIE J CHENEY**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Carlos Madrigal_ (Seal)

CARLOS MADRIGAL
COMM. #2145596
Notary Public - California
Santa Clara County
My Comm Expires Apr 5, 2020

Individual Loan Originator: **SUSAN NEALON**, NMLSR ID: **387725**
Loan Originator Organization: **CROSSPOINT FINANCIAL INC.**, NMLSR ID: **56921**
Loan Originator Organization (Creditor): **LOANDEPOT.COM, LLC**, NMLSR ID: **174457**

## Exhibit "A"

Real property in the City of **Concord**, County of **Contra Costa**, State of **California**, described as follows:

**A CONDOMINIUM COMPRISED OF:**

**PARCEL ONE:**

**AN UNDIVIDED 2.09% INTEREST IN AND TO LOT 1, AS SHOWN ON THE MAP OF SUBDIVISION 5554, FILED MARCH 12, 1980, IN MAP BOOK 235, PAGES 48 AND 49, CONTRA COSTA COUNTY RECORDS.**

**EXCEPTING THEREFROM:**

**THAT PORTION GRANTED IN THE DEED FROM HOFMANN CONSTRUCTION CO., A CALIFORNIA CORPORATION, TO CONTRA COSTA COUNTY WATER DISTRICT, RECORDED OCTOBER 14, 1980, IN BOOK 10047, PAGE 223, CONTRA COSTA COUNTY RECORDS.**

**ALSO EXCEPTING THEREFROM:**

**A. UNITS 1 THROUGH 48, INCLUSIVE, AS SHOWN UPON THE CONDOMINIUM PLAN RECORDED JANUARY 27, 1983, UNDER RECORDER'S SERIES NO. 83-11655, OFFICIAL RECORDS OF SAID COUNTY.**

**B. THE EXCLUSIVE RIGHT TO POSSESSION OF ALL THOSE AREAS DESIGNATED AS GARAGES, PATIOS, BALCONIES AND UNCOVERED PARKING AREAS, AS SHOWN UPON THE CONDOMINIUM PLAN, ABOVE REFERRED TO.**

**PARCEL TWO:**

**UNIT 3, AS SHOWN UPON THE CONDOMINIUM PLAN REFERRED TO, ABOVE.**

**PARCEL THREE:**

**THE EXCLUSIVE RIGHT TO POSSESSION AND OCCUPANCY OF THOSE PORTIONS OF LOT 1 AS DESCRIBED IN PARCEL ONE, ABOVE, DESIGNATED AS BALCONY (B-___) AND PATIO (P-3), AS AN APPURTENANCE TO PARCELS ONE AND TWO ABOVE.**

APN #: **118-360-003**

## CONDOMINIUM RIDER

**CHENEY**
Loan #: 600104156
MIN: 100853706001041563

THIS CONDOMINIUM RIDER is made this **6TH** day of **AUGUST, 2018**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **LOANDEPOT.COM, LLC** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**5450 KIRKWOOD DR #A4, CONCORD, CA 94521**
[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

**KIRKWOOD KNOLLS**
[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent

**MULTISTATE CONDOMINIUM RIDER-** Single Family -Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
📟 33.27

**Form 3140 1/01** *(page 1 of 3 pages)*

|||||||||||
0018000000600104156

600104156

documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance**. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then:

(i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and

(ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance**. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation**. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent**. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender;

(iii) termination of professional management and assumption of self-management

**MULTISTATE CONDOMINIUM RIDER**- Single Family -**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

👁 33.27                                                           Form 3140 1/01 (page 2 of 3 pages)

0018000000600104156

600104156

of the Owners Association; or

    (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

    **F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_Paul E. Cheney_
_____
- BORROWER - PAUL E CHENEY

_Bonnie J Cheney_
_____
BONNIE J CHENEY

**MULTISTATE CONDOMINIUM RIDER**- Single Family -Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
33.27                                                                    Form 3140 1/01 *(page 3 of 3 pages)*

0018000000600104156

I hereby certify that this is a true
And correct copy of the original

ATTEST:

Deborah Cooper
County Clerk
Contra Costa County, California.

By:
Deputy Clerk

I hereby certify that this is a true
And correct copy of the original
On file in this office

ATTEST   APR 28 2020

Deborah Cooper
County Clerk
Contra Costa County, California
By_____ Deputy Clerk